May I begin? You may proceed. Thank you, Judge. My name is Kerry Giannullis. I represent the plaintiff appellant Mark Thomas. Okay, you're going to have to speak directly into the mic. Oh, I apologize, Judge. I apologize. My name is Kerry Giannullis, and I represent the plaintiff appellant Mark Thomas. This case is up on appeal, as the panel knows, pursuant to the allowance of certain defendants' motion for summary judgment in front of Judge Judith Dean. Two counts have been appealed by the plaintiff. I realize there's been extensive briefing. The appendix is quite voluminous. This case covers a lot of years, the facts of it, covers a lot of different issues. Okay, I understand at least one of the two claims is that there was adequate evidence of a conspiracy between the town manager and the investigator. Is that correct? Corrected. Then what is, as a state law matter, and then what is the second claim? The second claim is the denial of a mass Civil Rights Act claim asserted by Mr. Thomas against Mr. Harrington in his personal capacity. That claim, if I have the time, the appeal is much more based on legal issues. It's a much more complex state issue, too. I understand we might have some Wilbur v. Curtis issues here. We dealt with these issues with Judge Dean. Judge Dean dismissed many earlier claims of the plaintiff in motions dismissed. She then dismissed the final federal claim, which was a First Amendment retaliation claim. We do understand the procedural posture of the case. It seems to me in your limited time you should try to suggest to us where the judge went awry in concluding that there are no material facts in dispute so the summary judgment was appropriate. Thank you, Judge. Why don't you start with your conspiracy claim? Thank you. What are those material facts? In the conspiracy claim, we believe there's abundant, abundant disputed facts and many undisputed facts when viewed in their totality, which should have led the motion judge to allow that claim to proceed to jury. There's three tranches of areas where we believe that we have proven to the standard that there are disputed issues of material fact that this claim should have went to trial, to jury. First, the issue of Mr. Arrington, the town manager, and the independent investigator, Mr. St. Pierre, Chief St. Pierre. First, during Chief St. Pierre's interviews of many of the police officers, he testified that he would take every interview and that he took notes. Testimony by one of the police officers interviewed, and this was during the L'Esperance investigation and later during the Thomas investigation, that Mr. or Chief St. Pierre turned off the recorder and stated to this police officer while questioning about Mr. Thomas, this is not what I'm looking for. Now, there were many allegations against Mr. Thomas. Our theory is that Mr. Arrington and St. Pierre wanted him fired, didn't really need the investigation, this was all a reverse investigation just to cover up. The magistrate judge says that Mr. Arrington was prepared to dig deep to find something against Thomas, but also says there's no indication that any evidence was fabricated or manipulated and in fact the arbitrator, although the arbitrator does undo the termination decision of Mr. Arrington, also makes the same observation that there's no suggestion that any evidence was fabricated here. Is your point, the point that you're making, that there was some suggestion that evidence was fabricated or at least omitted? Omitted. Evidence omitted on the front end issue of the interviews of these police officers, which has been fully briefed. On Judge Dean's, was there distorted and manipulated evidence? We believe this Officer Svorza manipulated evidence, which the arbitrator in his decision fairly did say didn't make any sense. Now I understand that was a year after this investigation, but these reports from Mr. Svorza, who was a known enemy of Mr. Thomas, were in front of Mr. St. Pierre and Mr. Arrington. So we believe they're distorted evidence. We believe the questioning of certain... of evidence. We believe the manipulation of evidence included using Svorza's report, which they all knew was produced by a person who had great animus towards Mr. Thomas, who had earlier taken Mr. Thomas, who had earlier done other things to Mr. Thomas. They knew this. He'd also been removed from the Thomas investigation and he still was working for the investigation. We believe distorted and manipulated evidence includes Mr. St. Pierre turning off the tape recorder and asking an important witness, that's not what I'm looking for. Now first, why would you turn off the tape recorder? That would be a question if a witness was going the wrong way, you would want that on the record was turned off. There's an inference that Mr. St. Pierre was attempting at not just bad or truthful yet evidence that would be bad for Mr. Thomas. The inference one could draw, and we're at summary judging here, the inference one could draw is he wanted to lie. There's also testimony, or make something up about Mr. Thomas. There's also testimony that the tape recorder was turned off for an officer's e.o. So that's Mr. St. Pierre. What evidence is there that Harrington was somehow complicit in this attack? And Judge Steen did issue that we can't show meaning in the mind of substantial assistance. First, Mr. Harrington hired Mr. St. Pierre before any suggestion by anybody to hire him. They were old friends. Mr. Harrington, and I'm just giving a back story, Mr. Harrington... St. Pierre's turning off the tape recorder. That it was directly ordered by Mr. Harrington? What is the evidence of that? I only have the evidence that Mr. Harrington totally controlled the investigation. Put the investigator in place who was an old friend, who he had a special relationship with. So there was some evidence that Mr. Harrington was communicating with St. Pierre during the investigation, but so what? Was there anything improper? I don't know if Mr. Harrington was communicating with St. Pierre during the course of the investigation. Well, this is supposed to be an independent investigation, and Mr. Harrington, under the state statute, would have been the official who would decide if Mr. Thomas could be fired. I don't know if it's illegal for him to talk to him in that sense, but it's probably not. It could show bias or influence the investigation. Well, is there any evidence in the record about the nature of those communications? Well, the communications are in the record. There's eight or nine communications. In one communication, Mr. Harrington says to Mr. St. Pierre that he had already come to a conclusion about something that Mr. Thomas had done wrong, which, was it accurate? There's also communication among Mr. Harrington, Mr. St. Pierre, and another in which the other writes to these two individuals, I think Thomas just shot himself in the foot. Now, these communications are going between Mr. Harrington and Mr. St. Pierre during the investigation. No, I do not have a smoking gun, as I said in my briefing. I don't have Mr. Harrington writing to Mr. St. Pierre. I don't care what you do, get rid of Thomas. But I think if you look at how the investigation was conducted by Mr. St. Pierre, who was under total control of Mr. Harrington, you look at the communications between the two, and if you look at the use of this Mr. St. Pierre. I'm sorry. They knew each other. You would have to admit that independently, the credentials of St. Pierre qualified him to be an investigator. They knew each other. They had communications. How do you get to he controlled everything St. Pierre did? Pardon me. First, in the factual record, Mr. St. Pierre was hired to investigate a Chief L'Espérance. After that investigation ended, Mr. Harrington asked Mr. St. Pierre to continue the investigation. Apparently, your client acknowledges that it was appropriate to begin the investigation. Isn't that so? He acknowledges that. It's in the record. But he also acknowledges that it should be done by an internal investigations officer. Plus, Mr. St. Pierre did, and it's in the record, say, I don't want to do this second investigation. Okay, counsel. Thank you. Mr. Sims. May it please the court, Adam Sims for Neil Harrington and Bob St. Pierre. Why don't I answer the questions that the panel just asked Mr. Giannullis? I'll try to take them in the order, as fast as I could write them. Judge Lopez, you asked, what evidence is there that Harrington was complicit in the destruction of the tapes? The answer to that question is none. None in this record that Mr. Harrington urged that the tapes be destroyed, that he knew at the time Mr. St. Pierre was going to destroy those tapes. There's nothing in this record to suggest that, you know, Harrington was complicit in the destruction of the interview tapes. Second, there was some question and answer about Officer Forza manipulating certain of his interviews, which is, again, Mr. Giannullis indicated came about a year after the investigation of Mr. Thomas. Again, nothing ties whatever Mr. Forza's motives may have been, whatever his animus toward Mr. Thomas. There is nothing in the record that suggests that either Neil Harrington or Robert St. Pierre was behind whatever Mr. Forza did or didn't do. That they encouraged it, that they condoned it, that they were even aware of it at the time it was going on. The third question, which just came up, Judge Lynch asked, well, there is evidence that Harrington and St. Pierre knew each other, and so what? And the answer to that is, so what? They had known each other for 25 or 30 years. I think that actually helps our claim in that Mr. Harrington went to someone he knew, a former chief of police, someone experienced in conducting internal affairs investigations. And then finally, the notion that Mr. Harrington controlled this investigation of either L'Esperance or Mr. Thomas, that's just apocryphal. I mean, I'm not going to repeat everything that's in our brief. And to go back to the start, I'm sorry. I think your opponent makes the point that eventually this investigation was going to come to Mr. Harrington, and that he would, as he did, he then convened a hearing to evaluate the investigations, the recommendations of Mr. St. Pierre. I gather he is supposed to be a fair and impartial adjudicator in that role. So why is he in ongoing contact with Mr. St. Pierre during this investigation when he is supposed to be that fair and impartial adjudicator once the investigation is received? And he has to make a decision whether Mr. Thomas will be terminated. I think the answer to that, your honor, is simply the length of the investigation. When you look at the vast majority of the email exchanges between Harrington and Bob St. Pierre, they're along the lines of, you know, I hope to wrap this up in a few more months. I know it's taken a fair amount of time. It's basically updates on the status of the investigation. I don't recall any email exchange along the lines of Neil Harrington saying to Bob St. Pierre, hey, there's these three other people, you really should interview them because they have a lot of dirt on Mr. Thomas. There is no, I mean, discovery in this case, your honor, was, I'll say ample, if not extraordinary. There were 10 or 12 depositions taken. Mr. Giannullis and I really, I think, did all we could to narrow the record presented to Judge Dean and then to this court. And in the vast discovery taken, there was no emails, there was no testimony that suggested that Harrington controlled this investigation. He did the same thing he did, excuse me. The magistrate judge, I think, does observe that, these aren't the words, but it seems like Mr. Harrington had an agenda with respect to Mr. Thomas. I think the phrase is, wanted those investigating to dig deep to find something on Thomas. There is an observation such as that in her opinion, is there not? I believe there is in a footnote that observation is made, and I think, if I remember the context, Judge Dean says, I'm going to acknowledge that such an inference could be drawn from some of the testimony. And asking an investigator to dig deep, I'm not aware of any claim that would support, certainly a MIPRA claim against Harrington on that basis. And it strikes me as rather odd that when you hear things like a faulty investigation, or an investigation that was rushed or hurried, that wouldn't be actionable under the Massachusetts Tort Claims Act, which allows claims of negligence, at least against the employer. Yet, somehow, it's sufficient to establish a civil rights claim where intentional wrongdoing is required? That just strikes me as the legislature, the Massachusetts legislature, could not have intended that result. Sorry, are you moving off of the conspiracy claim to the civil rights claim now? Is that what you're addressing? Well, whatever questions you want to ask. That's exactly the answer you gave, so let's go back to the conspiracy claim and the effect of this footnote. In Magistrate Judge Dean's opinion, it's a sort of so what, and digging deep does not mean conspiracy. I don't think even remotely, Your Honor, I understand that was an observation made by Judge Dean, and she factored it into her decision. But when one looks at the totality of the circumstances, I think that's probably an apt phrase here, of how uninvolved Neal Harrington was in the actual investigation of Mr. Thomas. Just as with Chief Lesperance, the investigation into Chief Lesperance, there was no investigation into his successor, Chief Sullivan, because he retired, and then another investigation was done by Mary Butler. Mr. Harrington didn't do anything differently with respect to Mr. Thomas than he did with respect to those other two investigations. He hired someone from outside the town of Salisbury, outside the police department. There was an allegation, never substantiated, that the investigations themselves required the approval of the Board of Selectmen. We obtained an affidavit from Selectmen-Clema, which is the only evidence in the records showing that that's not a requirement under the Salisbury Charter. Neal Harrington then stepped back and let, respectively, Chief St. Pierre and Lt. Butler conduct their investigations as they deemed appropriate. The two chiefs had retired, so no disciplinary actions were taken. Mr. Thomas chose to contest his discipline, his termination, as he had every right to do, through arbitration. The arbitrator ruled there was insufficient evidence. Using a preponderance of the evidence standard to show there was just cause for his termination, he was ordered reinstated. And in his 30-page decision, Mr. Bullinger, the arbitrator, who certainly is neutral, he has no axe to grind here, there's nothing, I mean nothing in his decision that suggests anything untoward, manipulative, nefarious. Pick a word, what was going on between Neal Harrington and Bob St. Pierre? Counsel, I mean I gather that the civil rights claim, which is directed only against Mr. Harrington, that seems to involve the period after reinstatement before Mr. Thomas decides to leave. I mean, the suggestion is that Thomas was going out of his way to make working conditions very unpleasant for Mr. Thomas, in the hope that he would leave. Isn't that the basic claim, that he wanted Thomas gone? Isn't that correct? That's the basic claim, Your Honor, that's correct. And so he, and to that end, he precluded him from practicing law, I gather, which he was able to do. He allowed other officers to moonlight. Thomas' form of moonlighting would be, I guess, to practice some law, and he didn't allow him to do that, so he treated him differently than he did the other officers. Counsel, on this practice of law issue, I didn't find the briefs all that helpful. Can you, when I looked at the record, it appeared not to be a flat prohibition against any practice of law. What does the record actually show? The record actually shows, Your Honor, two things. One, that decision was made by the current chief, not by Neal Harrington. At the very end, I think it's sort of the very end of Volume 3 of the administrative record, there's an email exchange between Neal Harrington and the current chief. And the current chief says, this is a policy of mine that I implemented when I was a chief in Connecticut, before I even came to Salisbury, that I will allow people to practice law, like Mr. Thomas, provided they sign a conflict of interest waiver, and don't take certain types of cases, like criminal law cases that might involve the town of Salisbury. That's what the record shows, Your Honor. I see my time is almost up. Unless the court has any further questions, I would ask that they affirm. And you might as well stay there while we ask Judge Stahl if he has any questions. Judge Stahl? I have a suggestion. I may have missed this, but for Mr. Harrington's lawyer, you might have had a qualified immunity argument in the district court, but you did not raise it there, and it did not weigh you there for. I'm sorry, Your Honor, I couldn't... The question is qualified immunity, and Judge Stahl has just pointed out that you haven't argued qualified immunity to us. Is that because this is a claim against Harrington in an individual capacity? I think it's a claim against Harrington in both of his capacities. That's what I understood. Right. You didn't raise that qualified immunity argument in the district court, did you? We did make that argument in the district court, yes. That Mr. Harrington would be entitled to qualified immunity acting in his individual capacity under the MICRA statute for, frankly, some of the very reasons that Mr. Giannullis stated just a few moments ago, that this is a very unsettled area of law, which to me suggests that it's not clearly established. Is your qualified immunity argument made in your brief to this court? I think very... To use a bad pun, I thought we did very briefly, but if not, this court can affirm on any of the bases raised in the district court below. Judge Stahl... That's fine. Okay. Thank you both. Thank you, Your Honor.